Argued at Pendleton October 30, 1919, affirmed January 6, 1920.

## CALDWELL v. HOSKINS.

(186 Pac. 50.)

**Trial—Instructions Covered by Those Given Properly Refused.**

1.  Where the instructions given fully covered every point embraced by the requested instructions, they were properly refused.

**Trial — Motion to Strike Covering Objectionable Testimony Only Properly Granted.**

2.  Proceedings at trial *held* to show that plaintiff's motion to strike defendant's testimony and the court's ruling thereon went to the exclusion only of defendant's narration of her conversation with physician, and did not exclude her conversations with plaintiff containing a competent admission by plaintiff.

**Evidence—Admission by Victim of Automobile as to Speed Admissible.**

3.  In an action for injuries by automobile, plaintiff's statement in conversation with defendant that, had defendant been driving faster, he would have been by before plaintiff got to the place of collision, was admissible.

**New Trial—Newly Discovered Evidence That X-ray did not Disclose Alleged Fracture not Ground for New Trial.**

4.  A new trial was not required by newly discovered evidence that several months after plaintiff was injured by defendant's automobile she was X-rayed and informed that her rib was not broken nor spine twisted, where the evidence showed that the automobile knocked plaintiff down while it was on the left-hand side of the street, and that she was dragged or rolled a considerable distance, and was severely shocked and bruised, and was confined to a hospital some time.

New Trial—Plaintiff Severely Injured did not Wrongfully Suppress
Evidence by not Offering X-ray not Showing Alleged Fracture.

5. Where plaintiff was knocked down by an automobile and
dragged a distance, was painfully and severely injured, confined to
the hospital for some time, and the physician who first examined her
did not discover a broken rib or twist of spine to which her subse-
quent attending physician testified, plaintiff, by not offering an
X-ray taken several months after the injury not showing the stated
injuries, did not wrongfully suppress evidence so as to. entitle de-
fendant to new trial.

From Umatilla: GILBERT W. PHELPS, Judge.

In Banc.

This is an action to recover damages for personal in-
juries caused by an automobile. There was a judg-
ment for the plaintiff; the defendants filed a motion for
a new trial which the court denied; and the defendants
appealed.

Court Street runs east and west through Pendleton
and is intersected by Beauregard Street which extends
north and south. On December 24, 1917, at about 5:45
P. M. the plaintiff was walking towards the east along
the sidewalk on the north side of Court Street on her
way to her home which was located on Court Street
but beyond and east of Beauregard Street, so that it
was necessary for her to cross Beauregard Street.
There was no light burning at the intersection of Court
and Beauregard Streets. It was very dark, according
to some of the testimony. Court Street, including the
area of its intersection with Beauregard Street, is
paved; but Beauregard Street is not paved. The edge
of the pavement across Beauregard Street "lines up"
with the north side of the sidewalk along Court Street.
Near the edge of the pavement on the east side of
Beauregard Street was a "mud hole" which "reached
about halfway to the middle of the street"; and the
witnesses say that after leaving the pavement Beaure-
gard Street was "muddy."

J. T. Hoskins and Cora H. Hoskins are husband and wife and Vashti Hoskins is their daughter. The home of the defendants was located on the west side of Beauregard Street and in the second block north of Court Street. The defendants were returning from the country in an automobile driven by the daughter. They drove along Court Street until they came to Beauregard Street, when they turned to their left with the purpose of going north along Beauregard Street to their home. At the moment when the defendants turned into Beauregard Street the plaintiff was crossing that street and was struck by the automobile.

The plaintiff alleged that the defendants drove along the north side of Court Street and while going "at a dangerously high rate of speed" turned into the left-hand side of Beauregard Street and struck her while she was "using the extreme west side of Beauregard Street as a pedestrian." The defendants averred that they drove along the south side of Court Street until they reached Beauregard Street when they turned the automobile "in a northerly direction," but "east of the center" of the street intersection, and, while "traveling at a speed of about 8 miles per hour" and when the automobile "was about to enter the said Beauregard Street," the plaintiff suddenly appeared on the east of the center line of Beauregard Street and was struck by the automobile notwithstanding prompt efforts made by the defendants to avoid the accident.

After having been struck by the automobile the plaintiff was picked up and carried into the near-by home of R. T. Hales where she remained about "half an hour," and then she was taken to the hospital. About 5 o'clock "the next evening" she was removed to her home, where "she was in bed 2 months"; but

at the end of 3 months, she was able to resume work in a laundry.                    AFFIRMED.

For appellants there was a brief over the names of *Mr. James A. Fee, Mr. Charles Z. Randall* and *Mr. R. I. Keator,* with oral arguments by *Mr. Fee* and *Mr. Randall.*

For respondent there was a brief over the name of *Messrs. Raley & Raley,* with an oral argument by *Mr. James H. Raley.*

HARRIS, J.—1. Four of the assignments of error relate to the refusal of the court to give certain requested instructions. The bill of exceptions contains recitals to the effect that each of these four requested instructions was refused "on the ground that the same was covered by other instructions." An examination of the charge to the jury discloses that the instructions as given fully covered every point embraced by the requested instructions; and, moreover, the language used by the court was so clear and fair and plain that the jury must have understood and appreciated the meaning and extent of every rule of law submitted to them for their guidance.

2. Another assignment of error related to a ruling on a motion to strike out certain testimony given by Cora Hoskins, one of the defendants. Cora Hoskins and her brother, E. R. Baker, called on the plaintiff shortly after her removal to the hospital and a conversation occurred between Cora Hoskins and the plaintiff in the presence of E. R. Baker and the plaintiff's mother, Mrs. Belinda Collins. The question to be decided will be better understood if the following portion of the record is first read:

"Q. State whether or not you ever visited her at the hospital while she was there?

"A. Yes, sir, within just about half an hour I judge after she was up there my brother came up to our house. * *

"Q. Who is your brother?

"A. Irvin Baker. And I asked him if he would go with me to the hospital to see this woman and he said yes and we went up and I went in and asked her if I could do anything for her. She seemed kind of cross at me but her mother was not. She was very friendly with us, and I·said to her if we had been going fast I said you would have been hurt real bad. She said if you had been going fast you would have been past when I got there and I told her to stay there as long as she . wanted to and I would see that it was paid. I also told Dr. Parker the same. I told him to wait on her just as long as she needed him.

"Counsel for plaintiff moves to strike out all that answer of the witness as not tending to prove or disprove any of the issues of the case and incompetent.

"The Court: So far as the testimony of Dr. Parker is concerned the testimony is allowed. The motion is allowed.

"Q. Is this something you told the woman herself?

"A. Yes, sir."

It will be observed that the answer of the witness is really a narrative of three different conversations with three different persons, for it tells about: (1) Her talk with her brother; (2) her conversation with the plaintiff while at the hospital; and (3) her statement to Dr. Parker. The defendants contend that the wording of the motion included all the answer of the witness and that the jury must have understood from the language of the court that the entire answer, including the alleged statement of the plaintiff that "if you had been going fast you would have been past when I got there" was stricken out. The plaintiff claims, on the other

hand, that after the words "it was paid" there was "a pause in the answer and apparently upon second thought the witness concluded to add something further" and then told what she had said to Dr. Parker. The defendant challenges the claim that there was any such pause in the answer, and of course it is impossible for us to determine from a mere paper record, which purports to do no more than to inform us of the words which fell from the lips of persons, whether there was a pause in the answer as claimed by the plaintiff. However, if the objection made by plaintiff was directed against that portion of the answer only which referred to Dr. Parker the language employed by the plaintiff was adequate for the purpose, especially if the word "that" was emphasized by a rising inflection. Indeed, the language employed was not at all unusual or extraordinary. While other expressions might have been used, and although the words "that answer" are broad enough to include the whole answer, yet they are the words which many lawyers would naturally employ when moving against only a part of an answer. It is perfectly clear from a reading of the record that when the trial judge said "so far as the testimony of Dr. Parker is concerned the testimony is allowed," it was a "slip of the tongue"; for he immediately corrected himself and said "the motion is allowed," obviously meaning that "so far as the testimony of Dr. Parker is concerned the motion is allowed." This view finds confirmation in a subsequent portion of the record. E. R. Baker was called as a witness for the defendants and on direct examination he told about accompanying his sister to the hospital, and when asked to relate the conversation which occurred between his sister and the plaintiff he answered as follows:

"Mrs. Hoskins asked how she was and she told her, and she says it is a good thing we were driving slow or you might have been hurt much worse, Mrs. Hoskins said to Mrs. Caldwell, and Mrs. Caldwell kind of raised up in bed a little and looked around and she said 'Well if you had been driving faster you would have been by before I got there.' "

3. If the attorney for the plaintiff had intended to move against the whole answer given by Mrs. Hoskins, or if the trial judge had intended to strike out all the answer of Mrs. Hoskins, we would naturally expect a motion by the plaintiff to strike out the answer given by Baker and a ruling of the trial judge allowing the motion; but no objection was made to the question or answer. It must be conceded that the defendants were entitled to show that the plaintiff stated "if you had been going fast you would have been past when I got there," if she did so state, because such a declaration would be in the nature of an admission that the defendants were not going fast. The plaintiff did not deny making the statement, while E. R. Baker said that she did make it; and we think that it is sufficiently clear from the record that the court struck out only that part of the answer of Cora Hoskins which refers to Dr. Parker and that it was so understood by the jury; and that therefore the defendants had the benefit of the testimony of Cora Hoskins concerning the alleged admission of the plaintiff.

4. The most important assignment of error arises out of an X-ray examination of the plaintiff. As a preliminary to the discussion of this branch of the case, we may with propriety refer to some of the evidence concerning the exact place where the plaintiff was when struck, the speed at which the defendants were going, and the injuries sustained by the plaintiff. As already

stated the plaintiff claimed that the defendants turned into Beauregard Street on the west side of the street and that she was struck when near the west side of Beauregard Street; while the defendants insisted that when they turned to enter Beauregard Street they were east of the middle of that street. Both the driver of the automobile and J. T. Hoskins admitted that they "aimed to go to the left of the mud hole," which according to the testimony of Charles Hoskins, a son of J. T. Hoskins and Cora Hoskins, "reached about halfway to the middle of the street." The cement sidewalk on the north side of Court Street projects into Beauregard Street for a distance of 10 feet from either side of the street, so that the distance across Beauregard Street between these ends of the sidewalk is 30 feet.

The plaintiff testified that "the car struck me and knocked me down and ran over me, and I went between the wheels" and "I was rolled over and over under the car." R. T. Hales and Charles Daniels were standing on the parking in Court Street in front of the former's house when the accident occurred, and, according to their testimony, they reached the plaintiff before any of the defendants were able to get out of their car and go back to where the plaintiff was lying. The plaintiff was found "lying almost on her back, a little bit on her left side in the mud." Hales and Daniels said that the place where they found plaintiff was 2 feet west of the middle line of the street and 27 feet north of the edge of the pavement; and that the rear of the car was 35 feet north of the place where they found the plaintiff.

Hales testified that after the plaintiff was carried into his house she "complained of being sick at her stomach." There was evidence from which the jury

could have concluded that the plaintiff was dazed or even unconscious when she was taken into the Hales house. The plaintiff testified, when telling about the accident, as follows:

"And I was hurt inside I knew, but I didn't know how bad. I felt as though I was tore loose inside some place, and I thought my head was broken open or that my head was broken off my neck and my elbows was bruised and scratched up and skinned and my knees, my clothing on my knees was cut, and my stockings and my underwear was cut and tore, and my knees were all skinned up and I was black and blue from the back of my head down the right side"; and "I was in terrible agony."

When asked to describe "the effects from that injury at the present time" the plaintiff testified as follows:

"My side hurts me, my rib hurts me, and my side in there hurts me, and I can't walk very fast or very much because my side hurts me and my rib and side all the way up here; my rib is broken and it bothers me all the time."

Mrs. Belinda Collins, who nursed the plaintiff, testified that the back of plaintiff's head was bruised and that she "seemed to suffer so much from her head down to her shoulders to her waist line, that seemed to be her main trouble, and pain in the side here."

Dr. Parker looked plaintiff "over slightly" at the Hales house; but after her removal to the hospital he made a thorough examination and did not discover "any injury to the spinal cord or column rather, or to the ribs"; and when asked "if she had had a severely broken rib at that time, or an injury to the spinal column would your examination have disclosed it?" He answered thus: "Possibly it would, yes, sir. I would imagine if it had been very serious."

J. L. Hoisington, an osteopathic physician who had practiced his profession in Pendleton for 14 years, was called to see the plaintiff on December 29, 1917, and from that time on was the attending physician. This witness testified as follows:

"I got the history of the case somewhat, and what observation I could observe at the time, and found, first I noted what I term nervous shock, judging it from her depression and weakness, for what I could see no physical cause for, and in addition to that I found her very sore at a number of points, especially the right side; and on examination I found what I classed at that time as a broken rib, the eighth rib was broken in the axillary line. The condition at the head of the rib and vertebrae from which it comes was too tender at that time to make a complete examination and all my information of that was gotten by later examinations and at a subsequent time when I got the tenderness out so I could make the examination. The spine was twisted between the eighth and ninth vertebrae and it is a twist that still remains."

The motion for a new trial which the defendants filed and the court denied was based upon affidavits to the effect that a few minutes before the jury returned the verdict the attorneys for the defendants learned of a rumor that the plaintiff had caused an X-ray photograph to be taken; that there was no opportunity to verify the rumor until after the verdict was received; that afterwards upon making inquiry the defendants ascertained that on June 22, 1918, the plaintiff went to Dr. Boyden, of Pendleton, who on that date took an X-ray photograph of her spinal column and ribs, and that "said photograph showed that there had never been any injury to the spine and ribs of plaintiff"; and that after the photograph was taken Dr. Boyden "informed plaintiff personally that she had not sustained any injury to her spine or ribs."

The defendants contend that a new trial should have been granted because, they argue, (1) the plaintiff was guilty of misconduct in suppressing and concealing the X-ray examination; and (2) the X-ray examination, in the circumstances already stated, constituted newly discovered evidence which the defendants could not with reasonable diligence have discovered and produced at the trial.

The verdict of the jury forecloses debate as to whether the defendants were or were not guilty of negligence as charged in the complaint. The jury could not have found for the plaintiff without having first decided that the defendants had been negligent; and, therefore, the plaintiff was entitled to a verdict for some amount of money if she was injured at all. We need not and do not attempt to decide the extent of the injuries sustained by the plaintiff, and yet we may fairly infer, from the fact that the verdict was for the plaintiff, that the jury believed the testimony of Hales and Daniels, who for aught that appears in the record were disinterested witnesses, when they said that the plaintiff was lying in the mud 27 feet from the pavement upon which she was walking when first struck by the automobile, and that the car, which the driver testified was stopped "as soon as possible," was 35 feet north of the place where the plaintiff was found. In other words, notwithstanding the fact that the driver of the automobile applied the brakes promptly upon discovering the presence of the plaintiff, she was thrown and rolled and dragged at least 27 feet and the car was not stopped until it had gone 35 feet farther or a total distance of 62 feet from the pavement. The mere statement of these facts at once suggests inevitable injury to the plaintiff in some degree, and, in the light of all the testimony, it would be difficult to

94 Or.—37

understand how the jury could have avoided awarding a verdict for more than a nominal amount, even though it is assumed that the plaintiff's rib was not broken and that her spine was not "twisted." In this view of the situation, the evidence about the rib and spine affected the amount of the verdict rather than the right to a verdict.

The X-ray examination was not made until June 22, 1918, or 6 months after the date of the injury. The X-ray photograph was not made a part of the record nor exhibited to the trial judge. There is no affidavit by Dr. Frank Boyden, notwithstanding the fact that plaintiff testified as a witness in her own behalf and by doing so consented that the physician might testify as a witness: *Forrest* v. *Portland Ry., L. & P. Co.,* 64 Or. 240 (129 Pac. 1048). While we do not intend to decide whether the trial judge could have compelled the plaintiff to submit to an examination upon the application of the defendants, yet we may with propriety note the fact that the plaintiff was not requested to permit physicians chosen by the defendants to examine her condition, and, so far as the question of injury was concerned, the defendants were apparently willing to rest their whole case on the testimony of Dr. Parker and one of the nurses at the hospital. Dr. Hoisington did not attempt to testify as to the extent to which any rib was broken. The plaintiff was a witness in her own behalf and she was cross-examined. The defendants had ample opportunity to inquire as to whether or not any other physician had examined her and whether an X-ray photograph had been taken; and yet no such inquiries were made. In view of the fact that the defendants did not take full advantage of the opportunities offered by cross-examination and in view of the other facts shown by the record, we do not think that

we would be justified in reversing the trial court and holding that he should have allowed a new trial on the ground of newly discovered evidence: *McClendon* v. *McKissack,* 143 Ala. 188 (38 South. 1020); *Morrison* v. *Carey,* 129 Ind. 227 (28 N. E. 697).

5. Section 174, subdivision 2, L. O. L., provides that a new trial may be granted on account of "misconduct of the jury or prevailing party." If during the course of a trial it appears that evidence has been willfully suppressed, the opposing party is given the benefit of the disputable presumption that the suppressed evidence would be adverse to the party suppressing it: Section 799, subd. 5, L. O. L. We may assume, for the purposes of the discussion, that, if after a trial it is ascertained that the prevailing party has willfully suppressed evidence, it amounts to misconduct within the meaning of Section 174, L. O. L. But can it fairly be said that the plaintiff was guilty of suppressing evidence? The plaintiff knew whether she suffered any pain and she also knew where the seat of the pain was. So overwhelming is the evidence, that it may be said to have conclusively established that she suffered pain in the side. The physician who examined her on the evening of the accident stated that he did not discover any broken rib or twisted spine. The physician who called upon her five days afterwards and from that time on acted as her attending physician testified that her rib was broken and that her spine was twisted. The X-ray photograph was not taken until 6 months after the accident and, for aught that appears in the record, the broken rib, if there was one, may have completely united, leaving no evidence of a former break. We are not advised as to whether medical men would say that a break either sometimes or always leaves evidence of the break which an X-ray photograph will in-

variably picture; nor do we know how serious the break must be in order to leave permanent evidence of the fracture. If the plaintiff's rib was broken, it may be that it was a slight break and no evidence of the fracture remained on June 22, 1918, when the X-ray photograph was taken. The plaintiff was not bound to believe the opinion of the physician who took the X-ray photograph 6 months after the accident; but knowing that she actually suffered pain and having been told by her attending physician that her rib was in truth broken, she had a right to believe, as she undoubtedly did, that her rib was broken; and she was under no obligation to call Dr. Boyden as a witness merely because his opinion based upon an examination made 6 months after the injury differed from the opinion of Dr. Hoisington. On the whole record we think in the language of the constitutional amendment, Article VII, Section 3, ''that the judgment of the court appealed from was such as should have been rendered in the case''; and therefore we conclude that the judgment appealed from ought to be and it is affirmed.

AFFIRMED.